AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California


FILED
JUN 19 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. **18MJ3476**
(1) One Black Apple iPhone Seized Under FP&F )
Number 2018-2504-900053-003 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 (incorporated herein)

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963 | Importation of Cocaine; Conspiracy to Import Cocaine |

The application is based on these facts:

See attached Affidavit (incorporated herein)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Ernesto Rancel, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6-19-18

_____
Judge's signature

City and state: San Diego, California        Hon. Nita L. Stormes, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE SEARCH OF<br><br>(1) One Black Apple iPhone Seized Under FP&F Number 2018-2504-900053-003; and<br><br>(2) One Silver Apple iPhone X Seized Under FP&F Number 2018-2504-900053-003. | **AFFIDAVIT OF SPECIAL AGENT ERNESTO RANCEL IN SUPPORT OF A SEARCH WARRANT** |
|---|---|

I, Special Agent Ernesto Rancel, having been duly sworn, declare and state as follows:

## I
## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search: (1) one black Apple iPhone seized under FP&F Number 2018-2504-900053-003 ("Target Device 1"); and (2) one silver Apple iPhone X seized under FP&F Number 2018-2504-900053-003 ("Target Device 2") (collectively, the "Target Devices"), and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to Unlawfully Import a Controlled Substance (the "Target Offenses").

2. The Target Devices were seized from Defendant Gabriel Romero ("Defendant") at the time of his arrest for Importation of Cocaine on March 23, 2018 at the San Ysidro, California Port of Entry. The Target Devices are currently in the possession of

Homeland Security Investigations as evidence and being held in the Otay Mesa Evidence Vault at 9495 Customhouse Plaza, San Diego, California 92154.

3. This search of the Target Devices supports an investigation and prosecution of the Defendant for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the Target Devices, as described in Attachments A-1 and A-2, will produce evidence of the Target Offenses, as described in Attachments B-1 and B-2.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II
## AFFIANT'S EXPERIENCE AND TRAINING

5. I am a Special Agent ("SA"), with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by HSI as a Special Agent since December of 2016 and I am currently assigned to the San Diego Tunnel Task Force.

6. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC"), where I received training on conducting federal criminal investigations, including, but not limited to, the gathering of evidence, preservation of a crime scene, and the use of electronic evidence. Prior to becoming a Special Agent with HSI, I was a United States Citizenship and Immigration Service Adjudications Officer from 2013 to 2016, and served in the United States Marine Corps

from 2001 to 2013. I obtained a Bachelor of Arts degree in Political Science from University of Florida in 2010, and a Masters degree in Security Leadership from George Washington University in 2012.

7. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

8. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, including cocaine, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

9. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

3

11. Based upon my training and experience as an HSI Special Agent, my participation in the investigation of narcotic organizations, and consultations with law enforcement officers experienced with narcotic trafficking investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, email, Internet, social networking websites, and voice messages.

    b. Drug smugglers believe that cellular telephones provide greater insulation and protection against court-ordered wiretaps because they can frequently change phones and/or numbers, and obtain pre-paid "burner" phones without providing their identifying information.

    c. Drug smugglers will use cellular telephones because they are able to monitor the progress of their illegal cargo while the conveyance is in transit.

    d. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations to facilitate the further distribution of their illegal cargo within the United States.

    e. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    f. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry within the United States.

    g. The use of cellular telephones by drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

    a.    tending to identify attempts to import cocaine, or other federally controlled substances from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of cocaine, or other federally controlled substances from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the importation of cocaine, or other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of cocaine, or other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

14. On March 23, 2018, at approximately 12:12 a.m., Defendant applied for admission into the United States via a vehicle lane at the San Ysidro, California Port of Entry. Defendant was driving a blue Dodge Ram truck bearing California license plates (the "Vehicle"). Defendant was the driver, sole occupant, and registered owner of the Vehicle.

15. United States Customs and Border Protection ("CBP") Officer Martinez was conducting primary inspections during this time. When Defendant approached Officer Martinez, he presented a United States passport card and gave a negative customs declaration. Defendant told Officer Martinez he was returning home to Chula Vista, California. Upon querying Defendant's information, Officer Martinez received a computer-generated alert and referred Defendant and the Vehicle to an area for secondary inspection.

16. In the secondary inspection area, the Vehicle was scanned using a Z-Portal X-ray machine. Upon scanning the Vehicle, Officer Tovar noticed large anomalies in the Vehicle's external fuel tank. Another officer then contacted a certified contract mechanic to assist with accessing the fuel tank.

17. At approximately 1:45 a.m., a mechanic from Apple Towing arrived. The mechanic removed the diesel fuel from the external fuel tank and then removed the tank

6

itself from the bed of the truck. Upon removing the external fuel tank, there was a non-factory access panel visible underneath it. Upon removing the access panel, Officer Law discovered six large black bundles covered in grease. These bundles weighed a total of 141.20 kilograms (311.29 pounds) and contained a substance that field tested positive for the properties of cocaine.

18. Post-*Miranda*, Defendant chose to waive his rights and make a statement. Defendant admitted the Vehicle belonged to him and he knew he was importing drugs. Defendant said he was in contact with a drug trafficking organization and instructed to drop off the Vehicle at Plaza Florido in Tijuana, Mexico. Defendant stated when he picked up his Vehicle, he was told to cross into the United States via the San Ysidro, California Port of Entry between midnight and 12:30 a.m. Defendant was told to leave the Vehicle outside his home in Chula Vista, California after he successfully crossed the Vehicle into the United States.

19. Defendant said he has previously crossed loads of drugs into the United States approximately three to four times. He said he was paid $5000 for each smuggling event. Upon being told that officers discovered cocaine in the Vehicle, Defendant claimed to believe he was smuggling marijuana. Defendant claimed to have made the arrangements for the smuggling events via telephone.

20. I reviewed the border crossing histories for Defendant and the Vehicle. This review showed that Defendant has frequently crossed the border in a consistent pattern since January 2018. Defendant crossed in the Vehicle through the San Ysidro, California Port of Entry between approximately 3:00 and 4:00 a.m. almost every day since January 6, 2018. There is an approximately two-week gap in Defendant's crossings between December 20, 2017 and January 6, 2018, but then the crossings continue to follow roughly this same pattern back to at least January 2017.

21. Based on my experience investigating narcotics smugglers and Defendant's own admissions, there is probable cause to believe Defendant used the Target Devices to coordinate with his co-conspirators regarding the importation and delivery of the cocaine,

7

and to further this conspiracy both inside and outside the United States. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Devices. This data may include information that is relevant to Defendant's narcotics smuggling activities, including identifying identify other persons involved in their narcotics trafficking activities.

22. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. In this case, evidence supports probable cause to search the Target Devices for information dating back to December 1, 2017. This is based upon a review of Defendant's statements, and TECS records showing that Defendant and the Vehicle have regularly crossed into the United States except for a gap in late December 2017 / early January 2018. Therefore, the date range for this search should be from December 1, 2017 to March 23, 2018.

## III

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network.

Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the Target Devices and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV

## CONCLUSION

26. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the Target Devices to facilitate the importation of cocaine (and conspiracy to do the same) in violation of Title 21, United States Code, Sections 952, 960, and 963.

9

27. Given Defendant's statements and border crossing history, probable cause exists to believe that evidence of the aforementioned offenses exists on the Target Devices for the period of December 1, 2017 to March 23, 2018.

28. Because the Target Devices were promptly seized during the investigation of Defendant's drug trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activity committed by Defendant continues to exist on the Target Devices.

29. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B-1 and B-2 (incorporated herein) are likely to be found in the property to be searched described in Attachments A-1 and A-2 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachments B-1 and B-2.

I declare under penalty of perjury that the foregoing is true and correct.

Special Agent Ernesto Rancel
Homeland Security Investigations

Sworn to and subscribed before me this ___19___ day of June, 2018.

HONORABLE NITA L. STORMES
UNITED STATES MAGISTRATE JUDGE

10

## **ATTACHMENT A-1**

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963 is a black Apple iPhone seized under FP&F Number 2018-25-4-900053-003 ("Target Device 1").

 

Target Device 1 is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence and being held at Otay Mesa Evidence Vault at 9495 Customhouse Plaza, San Diego, California 92154.

## **ATTACHMENT B-1**

Authorization to search Target Device 1 described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in Target Device 1 for evidence described below. The seizure and search of Target Device 1 shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 1, 2017 to March 23, 2018:

a. tending to identify attempts to import cocaine, or other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers— used to facilitate the importation of cocaine, or other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of cocaine, or other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of cocaine, or other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, Target Device 1; and/or

  f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.